IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MICHAEL ANTHONY BROWN, #404343    *
       Petitioner,
v.                                       *    CIVIL ACTION NO. RDB-14-893

FRANK BISHOP, *et al.*,              *
       Respondents.
                                     *****

## MEMORANDUM OPINION

Petitioner Michael Anthony Brown (hereinafter referred to as "Brown") seeks habeas corpus relief pursuant to 28 U.S.C. § 2254, attacking the constitutionality of his 2012 conviction in the Circuit Court for Harford County. ECF Nos. 1 & 4. This matter has been fully briefed. ECF Nos. 5, 8, & 10. Upon review, the Court finds no need for an evidentiary hearing. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2014); *see also Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (Petitioner not entitled to a hearing under 28 U.S.C. § 2254(e)(2)). For reasons that follow, Brown's Petition of habeas corpus IS DENIED AND DISMISSED WITH PREJUDICE.

### Background and Procedural History

After his pre-trial motion to suppress was denied, in March of 2012, Brown was tried by a jury in the Harford County Circuit Court before Judge Stephen M. Waldron. ECF No. 5-1, Filed Separately Exhibits 4-8. The following facts were adduced at trial by the Court of Special Appeals of Maryland:

> In the early morning hours of August 18, 2007, the appellant was driven by his friend and roommate, Mark Christian, to the Emergency Room of Franklin Square Hospital in Baltimore County for treatment of a gunshot wound to his left foot. Hospital staff called the police to report the shooting. Health care providers at the hospital removed a bullet from the appellant's foot, and treated his wound.

Officer David Crum, of the Baltimore County Police Department, arrived in response to the call from the hospital staff. He questioned the appellant and Christian separately about the shooting. Initially, the appellant said he had been shot near a diner. He then said he had been shot during an attempted robbery at a gas station. Officer Crum had other officers go to the locations of the gas station and the diner. The police could not find any evidence of a shooting at either location. Officer Crum contacted Detective Mark Janowitz, of the Violent Crimes Unit, who came to the hospital. He had been told that the stories that the appellant and Christian were giving about the shooting were inconsistent. Detective Janowitz interviewed both men at the hospital.

The Baltimore County police impounded Christian's vehicle from the hospital parking lot so it could be searched for evidence related to the shooting. After obtaining a warrant, the police searched Christian's car. Inside it, they found a handgun and ammunition in a woman's purse. The police did not recover any other items of evidentiary value. The police also collected as items of evidence the bullet that was extracted from the appellant's foot and a blood-splattered boot the appellant had been wearing when he arrived at the Emergency Room.

The appellant was discharged from the hospital later in the morning of August 18, 2007, and was transported directly to the Baltimore County Police Department headquarters for additional questioning by Detective Janowitz about the shooting. In a recorded interview, the appellant gave yet a third story, saying he had been shot at a liquor store in Baltimore City. He then changed his story once again, saying that Christian had accidentally shot him while Christian was cleaning his gun at the apartment the men shared on Elmora Avenue in Baltimore City. Although Detective Janowitz did not believe the appellant's various explanations that he was the victim of an attempted robbery somewhere in Baltimore City or Baltimore County, the detective finally accepted that the appellant was shot accidentally by Christian while he was cleaning his gun at their shared apartment.

Baltimore County police notified the Baltimore City Police Department about the reported shooting at the apartment on Elmora Avenue. Baltimore City Police Detectives Kirk Henry and Gregory Jenkins went to the Baltimore County Police headquarters and interviewed the appellant and Christian after Detective Janowitz was finished with his interviews. They also secured a warrant to search the residence where the appellant and Christian lived. The search did not produce evidence related to a shooting or any other criminal activity.

It so happened that also on August 18, 2007, at around 11:30 p.m., the body of Robert "Rob" Hemphill was discovered in the room where he had been living at the Keyser Motel, in Aberdeen. Hemphill's normally "neat" room had been ransacked, and Hemphill had been beaten and shot in the back and in the left thigh. The medical examiner was unable to determine conclusively the time of death but, based on the state of Hemphill's body at around 3:20 a.m. on August 19, 2007, his death was believed to have occurred 18 to 24 hours before that time.

2

Hemphill had been living at the Keyser Motel because he was in the Federal Witness Protection Program. Before entering the program, he had lived in Baltimore City, and had testified in a federal trial against "a couple of drug dealers and murderers" who were "part of a pretty violent drug organization." After testifying, Hemphill "had legitimate concerns about his safety if he were to live in Baltimore City." Through the Federal Witness Protection Program, Hemphill both lived at the motel in Aberdeen and worked in Harford County. At the time of his death, no specific threats had been reported against him.

Hemphill's body was discovered by his friend, Rodney Scott who also lived at the Keyser Motel. Before August 18, 2007, Hemphill and Scott had worked together at C&S Wholesale grocers, a nearby company. Scott reported that he had last seen Hemphill after they finished work and returned to the motel the previous night, August 17, 2007, around 9:00 p.m. According to Scott, Hemphill did not have a bank account, so he would cash his weekly paycheck at a nearby liquor store. Hemphill had been saving his money to purchase a car, and had saved enough to do so at the time of his death. It was common knowledge among Hemphill's family, friends, and associates that he usually carried a substantial amount of cash on his person and that he kept cash in his motel room.

After the Harford County Police Department's initial investigation, no leads developed, and the case of Hemphill's death became dormant.

Approximately three years after Hemphill's murder, a detective investigating cold cases decided to look into whether there was a connection between Hemphill's death and the appellant's gunshot injury, given that both occurred in the early morning hours of August 18, 2007, and neither was explained. The detective learned that the appellant and Christian had worked with Hemphill at C&S Wholesale and were known to be friends with him.

Forensic testing was performed on the bloody boot the appellant had been wearing when he arrived at the hospital. The testing showed that the appellant's blood was on the inside of the boot, but *Hemphill's* blood was splattered on the top of the boot. Ballistics testing confirmed that one of the two cartridge casings found in Hemphill's motel room had been fired from the handgun that had been recovered from Christian's vehicle. The other cartridge casing found in Hemphill's room was fired from a different handgun. Examination of the two bullets that were recovered by the police-one from Hemphill's motel room, and the other from the appellant's foot-were inconclusive as to which gun or guns the bullets had been fired from.

On May 31, 2011, the appellant was indicted in the Circuit Court for Harford County for crimes stemming from Hemphill's death: (1) armed robbery; (2) attempted armed robbery; (3) conspiracy to commit armed robbery; (4) theft over $500; (5) first-degree murder; (6) conspiracy to commit first-degree murder;

(7) illegal possession of a regulated firearm; (8) wearing, carrying, or transporting a handgun; and (9) use of a handgun in the commission of a crime of violence.

The case against the appellant was tried before a jury on March 14, 15, 19, and 20, 2012. The State's evidence included testimony of police officers who investigated the gunshot wound to the appellant's foot and those who investigated Hemphill's murder both initially and when the case was reopened; recorded interviews of the appellant by some of those officers; a ballistics expert with the FBI who testified that a shell casing taken from the scene of Hemphill's murder was fired from the handgun found in Christian's car; and a forensic DNA analyst who testified that Hemphill's blood was found on the appellant's boot.

The appellant testified on his own behalf. He acknowledged that he had worked with Hemphill at C&S Wholesale, but said he had left that job in November 2006. More important, he further acknowledged that, on the night of Hemphill's death, he and Christian had gone to the Keyser Motel and had visited him. The appellant denied that he was armed with a gun at that time or that he had had any intention to rob Hemphill. The appellant testified that, while he, Christian, and Hemphill were in Hemphill's motel room, a man wearing a mask and black clothing kicked in the door and started throwing things around the room. According to the appellant, the intruder hit Hemphill with a gun, and, when Hemphill fought back, the intruder's gun went off, fatally injuring Hemphill and shooting the appellant in the foot. The appellant said that the wound to his foot was so painful that for a few minutes after he was shot he could not see or hear anything. When he was again able to focus, he saw that Hemphill was dead and the intruder was gone. The appellant and Christian left the motel as quickly as they could. The appellant sought medical assistance from a family member who was a nurse. He and Christian then returned to Baltimore City. When the appellant's wound became too painful to bear, Christian drove him to the Franklin Square Hospital Emergency Room.

The appellant further testified that, during the attack in Hemphill's motel room, the intruder threatened him (the appellant) with the gun and said he knew the appellant's identity. The appellant attested that it was out of fear for his life that he did not report the incident to the police and then repeatedly lied to the police about the circumstances surrounding the shooting, even after he was arrested for killing Hemphill.

The jurors deliberated for a day and a half, returning their verdict on March 21, 2012. They found the appellant not guilty of using a handgun in a crime of violence, but guilty of first-degree felony murder, attempted armed robbery, and conspiracy to commit armed robbery. The State *nolle prossed* the remaining charges.

ECF No. 5-1, Filed Separately Exhibit 13, pp. 1-7.

On May 17, 2012, Judge Waldron sentenced Brown to life plus a consecutive twenty-year term. *Id.*, Filed Separately Exhibit 9. Brown, through counsel, noted an appeal to the Court of Special Appeals, raising the following claims:

1. The evidence was insufficient to support Brown's convictions.

2. The lower court erred in permitting the State to introduce a statement that Brown made to police, in the absence of prior *Miranda* warnings, based on the determination that Brown was not in custody when he made that statement.

ECF No. 5-1, Filed Separately Exhibit 10, p. 2.

In an unreported opinion filed on October 28, 2013, the Court of Special Appeals affirmed Brown's convictions, rejecting his two claims of error. *Id.*, Filed Separately Exhibit 13. Brown filed a self-represented petition for a writ of certiorari, requesting that the Court of Appeals of Maryland further review the two claims rejected by the Court of Special Appeals. *Id.*, Filed Separately Exhibit 14. On February 24, 2014, Brown's request for further review was denied. *See Brown v. State*, 437 Md. 66 (2014).

In his original Petition for a writ of habeas corpus, Brown again raises the claims he presented on direct appeal, namely that the evidence was insufficient to sustain his convictions and the trial court erred in denying his motion to suppress his statement to the police. ECF No. 1, pp. 5-6. In his Amended Petition, he alleges that the state appellate court committed error "in sustaining convictions based on a different theory not presented to the jury during trial." ECF No. 4.

**Threshold Considerations**

Timeliness & Exhaustion of State Remedies

The Respondents do not contend, and the Court does not find, that the Petition was filed outside the one-year limitations period set forth in 28 U.S.C. § 2244(d)(1). Further, insofar as

Brown is reasserting his appellate issues, the claims are exhausted for the purpose of federal habeas corpus review.

## Standard of Review

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute at 28 U.S.C. § 2254 sets forth a Ahighly deferential standard for evaluating state-court rulings@ *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005). This standard is "highly deferential" and "difficult to meet." *Cullen v. Pinholster*, 563 U.S. ___, ___, 131 S.Ct. 1388, 1398 (2011); *see also White v Woodall*, ___U.S.___, 134 S.Ct 1697, 1702 (2014), quoting *Harrington v. Richter*, 562 U.S. 86, ___, 131 S. Ct. 770, 786-87 (2011) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement.").

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) Aresulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States@; or 2) Aresulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.@ 28 U.S.C. § 2254 (d).

A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis under 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 131 S.Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "Rather, that application must be objectively unreasonable." *Id*. Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." *Id*. at 785 (internal quotation marks omitted).

Further under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id*. "[A] a federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett*, 599 U.S 766, 773 (2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id*. at 379.

7

The Antiterrorism and Effective Death Penalty Act (AEDPA) erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court. AEDPA requires "a state prisoner [to] show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error ... beyond any possibility for fairminded disagreement." *Harrington v. Richter,* 562 U.S. 86,___, 131 S.Ct. 770, 786–787 (2011). "If this standard is difficult to meet"—and it is—"that is because it was meant to be." *Id.,* 786. A federal court reviewing a habeas petition will not lightly conclude that a State's criminal justice system has experienced the "extreme malfunctio[n]" for which federal habeas relief is the remedy. *Id.,* 786 (internal quotation marks omitted).

### The Evidence Presented at Trial in Support of Conviction

Brown contends that there was no evidence that he possessed a larcenous intent or criminal agency. He therefore argues that he could not be convicted of first-degree felony murder, attempted armed robbery, and conspiracy to commit armed robbery.

In its October 28, 2013 Opinion, the Court of Special Appeals of Maryland rejected this claim, finding that:

> The State's theory of prosecution was that the appellant and Christian killed Hemphill in the course of attempting to rob him. At the close of the State's case, defense counsel moved for judgment of acquittal on all counts, arguing that there was no evidence that Hemphill had been shot in the course of a robbery or attempted robbery, and there was no evidence that the appellant was the shooter. The court denied the motion. At the close of the evidence, defense counsel renewed his motion for judgment of acquittal. The court again denied the motion.
>
> The appellant renews these arguments on appeal. He maintains that the State failed to adduce any evidence that Hemphill was killed in the course of an actual or attempted robbery in which the appellant was a participant. Specifically, the appellant maintains that there was no evidence that any items were missing from Hemphill's room after his death, or that the person or persons who shot Hemphill did so with the intent to steal his property. The appellant further maintains that, even if the evidence supports a reasonable inference that a robbery or attempted robbery took place, the evidence was legally insufficient to establish

his own criminal agency. Thus, the evidence was legally insufficient to support any of his three convictions.

The standard of review for legal sufficiency of the evidence in a criminal case is "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bordley v. State*, 205 Md. App. 692, 716 (2012) (emphasis omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also Breakfield v. State*, 195 Md. App. 377, 392-393 (2010) (opining that the question of legal sufficiency "is not whether the evidence should have or probably would have persuaded the majority of fact finders but only whether it possibly could have persuaded any rational fact finder.") (internal quotation marks and emphasis omitted). "If the evidence 'either showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt,' then we will affirm the conviction." *Bible v. State*, 411 Md. 138, 156 (2009) (alteration omitted) (quoting *State v. Stanley*, 351 Md. 733, 750 (1998)). We assess the record evidence de novo to determine whether it is legally sufficient to support the convictions. *See, e.g., Walker v. State*, 206 Md. App. 13, 41 (2012) (an assessment of the legal sufficiency of the evidence is not an evidentiary issue but a substantive issue, with respect to which an appellate court makes its own independent judgment, as a matter of law.") (alteration in original) (quoting *Polk v. State*, 183 Md. App. 299, 306 (2008)).

Pursuant to Maryland statutory law, and under common law principles, a killing committed during the perpetration of an armed robbery or attempted armed robbery, which are felonies, is first-degree murder under the felony murder doctrine. *See* Md. Code (2002, 2012 Repl. Vol.) § 2-201(a)(4)(ix) of the Criminal Law Article ("CL"); *Newton v. State*, 280 Md. 260, 268 (1977) (reciting common law principle). A person who participates in an armed robbery or an attempted armed robbery with an accomplice is guilty of murder if either the person or the accomplice commits a homicide during the perpetration of the crime, even if the death is accidental. *See Malik v. State*, 152 Md. App. 305, 330 (2003) (applying the accomplice liability rule). To support a conviction of first-degree murder under the felony murder doctrine, the State is required to prove the underlying felony and that the victim's death occurred in the course of the felony. *Finke v. State*, 56 Md. App. 450, 466 (1983).

In Maryland, the crime of attempted armed robbery is codified at CL section 3-403, but "retains its judicially determined [i.e., common law] meaning." CL § 3-401(e). As this Court has previously stated:

> Armed robbery requires the taking of property of any value, by force, with a dangerous or deadly weapon. The crime, however, is not committed unless there is an intention to deprive the owner permanently of his property or the property of another lawfully in his possession. A defendant is guilty of attempted armed robbery

9

> if, with intent to commit armed robbery, he engages in conduct which constitutes a substantial step toward the commission of that crime whether or not his intention is accomplished. A defendant is guilty of conspiring to commit armed robbery if he combines with one or more other persons to accomplish an armed robbery.
>
> The gist of conspiracy is the unlawful agreement, which need not be spoken or formal so long as there is a meeting of the minds reflecting a unity of purpose and design. The crime is complete when the unlawful agreement is made; no overt act in furtherance of the agreement is necessary.

*Bates v. State*, 127 Md. App. 678, 688 (1999) (citations omitted) (quoting *Monoker v. State*, 321 Md. 214, 221 (1990) (defining conspiracy)) (internal quotation marks omitted), *overruled on other grounds, Tate v. State*, 176 Md. App. 365 (2007).

Attempted armed robbery and conspiracy to commit armed robbery are specific intent crimes. *Id.* Whether the accused possessed the requisite state of mind at the time of the crime is a question of fact. Because criminal intent is subjective in nature, it is seldom proven by direct evidence; usually it is proven circumstantially, by reasonable inferences drawn from the surrounding facts. *See, e.g., Davis v. State*, 204 Md. 44, 51(1954) ("Since intent is subjective and, without the cooperation of the accused, cannot be directly and objectively proven, its presence must be shown by established facts which permit a proper inference of its existence.").

In a jury trial, a defendant may move for judgment of acquittal at the close of the State's case and at the close of all the evidence. Md. Rule 4-324(a). If the defendant unsuccessfully moves for judgment of acquittal at the close of the State's case and then offers evidence, the defendant withdraws the motion. Md. Rule 4-324(c). If the defendant then moves for judgment of acquittal at the close of all the evidence, the motion shall be decided based upon all of the evidence introduced -- the evidence introduced by the State and the evidence introduced by the defendant.

In the case at bar, the appellant moved for judgment of acquittal on all counts based on legal insufficiency of the evidence and, when the motion was denied, proceeded to put on a defense case, testifying in his own behalf. By putting on a defense case, he withdrew his motion. At the close of all the evidence, he again moved for judgment of acquittal on all counts based on legal insufficiency of the evidence. It is the trial court's denial of that motion that is before this Court on appeal. Thus, in determining whether the evidence was legally sufficient to support the convictions, we consider all the evidence introduced at trial, not just the evidence introduced by the State.

Viewed in the light most favorable to the verdicts, the evidence adduced at trial showed that either late on the night of August 17, 2007, or early in the morning of August 18, 2007, the appellant and Christian went to Hemphill's motel room at the Keyser Motel. Based on the appellant's ongoing relationship with Christian — that the men shared an apartment, that Christian later drove the appellant to the hospital, and that, according to the appellant's own testimony, he was with Christian at Hemphill's motel room on the night of Hemphill's murder — the jury reasonably could have concluded that Christian and the appellant were acting in concert when they went to Hemphill's motel room.

On the issue of the sufficiency of the evidence of criminal agency, the evidence favorable to the verdict showed that the police recovered two shell casings from Hemphill's motel room, but were able to find only one bullet. One of the shell casings found in Hemphill's room had been fired by the gun that later was recovered from Christian's car. The other shell casing was fired by a different gun that was never identified. From this evidence, reasonable jurors could have inferred that two assailants attacked Hemphill in his motel room on the night he died, and that Christian was one of them. Moreover, based on the further evidence that a bullet was recovered from the appellant's foot, that his boot had Hemphill's blood on it, and that the appellant acknowledged being in Hemphill's motel room on the night of his murder, jurors reasonably could have inferred that the appellant was the second of the two men who were in Hemphill's motel room and wound up in a fight with him, during which both Hemphill and the appellant were shot, Hemphill fatally.

On the issue of the sufficiency of the evidence of attempted armed robbery, which, because attempted armed robbery was the predicate felony also implicates the sufficiency of the evidence of felony murder, the evidence most favorable to the verdict was as follows. The appellant, Christian, and Hemphill previously had worked together at C&S Wholesale, and the appellant previously had visited Hemphill in his motel room. The appellant characterized his relationship with Hemphill as "old friend[s]." The evidence showed that it was well known among Hemphill's friends and family that he was saving his money to buy a car; that he did not have a bank account; that he cashed his paychecks at a nearby liquor store; and that he kept his cash in his motel room.

The evidence further showed that motel room was ransacked on the night of the murder, that Hemphill was beaten and shot in the back and leg, and that, when Hemphill's body was found, there was no money in his room. Hemphill's body was found in his motel room and that the room had been ransacked. Although disavowing any intent to rob Hemphill or any act constituting attempted armed robbery, the appellant testified that the ransacking of the motel room took place on the night Hemphill was shot and killed, while the appellant and Christian were in the room. Specifically, the appellant testified that the motel room door was kicked in by a masked intruder who threw the things in the room about.

> A finder of fact is free to believe all, part, or none of a witness's testimony. *Moody v. State*, 209 Md. App. 366, 387 (2013). Again viewing the evidence in the light most favorable to the verdict, the jurors in the case at bar reasonably could have found that Hemphill's motel room was ransacked on the night of his murder when the appellant was present and that the appellant (not a masked intruder) was the ransacker. The jurors reasonably could have inferred from their finding that the appellant ransacked Hemphill's room, and that the appellant likely knew of Hemphill's habit of keeping substantial amounts of cash in his room, that the appellant went to Hemphill's motel room on the night in question with the intent to steal his money; that the appellant attempted to rob Hemphill; that Christian, who was acting in concert with the appellant, was armed with a handgun; and that, in the course of the attempted armed robbery, Hemphill was shot and killed.
>
> All of this evidence was legally sufficient to prove that the appellant conspired with Christian to commit armed robbery against Hemphill, that they went to Hemphill's motel room with the intent to rob him, and attempted to do so, and that their acts resulted in Hemphill's shooting death in the early morning hours of August 18, 2007. The appellant's repeated lies to the police about where and under what circumstances he was shot added to the already sufficient evidence in the record to support his convictions.

ECF No. 5-1, Filed Separately Exhibit 13., pp. 7-13.

Any challenge to sufficiency of evidence is necessarily a due process challenge. *West v. Wright*, 931 F.2d 262, 266 (4th Cir. 1991), *overruled on other grounds*, 505 U.S. 277 (1992). In determining whether there is sufficient evidence to support a conviction the Court examines "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U. S. 307, 319 (1979). The fact finder, rather than the reviewing court, is charged with "resolv[ing] conflicts in the testimony, [weighing] the evidence, and [drawing] reasonable inferences from basic facts to ultimate facts." *Id.* Circumstantial as well as direct evidence must be considered and the prosecution must be given the benefit of all reasonable inferences. *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982). Circumstantial evidence alone can be sufficient to support a conviction. *Stamper v. Muncie*, 944 F.2d 170, 174 (4th 1991).

On direct review the intermediate appellate court found Brown's claim regarding the sufficiency of the evidence to be without merit. The Court finds no basis to overturn the Court of Special Appeals of Maryland decision. Review of trial transcript demonstrates there was sufficient evidence for the jury to reach guilty findings. The evidence adduced at trial shows that the victim's motel room had been ransacked; Brown acknowledged being in the motel room at the time it was ransacked and the victim was shot; a cartridge casing found at the scene matched a gun in Christian's vehicle and Brown admitted being with Christian on the day of the offenses; the victim's blood was found on Brown's shoe; and Brown was found with a gunshot wound to the foot on the day that the victim was shot. ECF No. 5-1, Filed Separately Exhibit 4, pp. 18-19, 61 & 159-160; Filed Separately Exhibit 6, pp. 11-27, 39-40, & 73-75 & 79. The evidence would permit a trier of fact to conclude that Brown and Christian intended to rob the victim in his room at the Keyser Motel; hence, Brown is not entitled to relief on this claim. *See* 28 U.S.C. § 2254(d).

**Trial Court's Denial of Brown's Motion to Suppress his Statement to the Police.**

In pre-trial motions, Brown moved to suppress statements made to Baltimore City and Baltimore County Detectives. ECF No. 5-1, Filed Separately Exhibits 2-3 & 15. Judge Waldron denied the motions. This issue was raised on direct appeal and rejected by the Court of Special Appeals. After conducting an extensive review of caselaw and the suppression hearing, the intermediate appellate court made the following statements:

> Before trial, the appellant moved to suppress the statements he made to Detective Janowitz of the Baltimore County Police Department, and to Detectives Henry and Jenkins, of the Baltimore City Police Department. Specifically, he sought to exclude from evidence a recorded un-*Mirandized* statement he made to Detective Janowitz at the Baltimore County Police Headquarters on the morning of August 18, 2007, and the subsequent statement he made to Detectives Henry and Jenkins after *Miranda* warnings were given.[] The circuit court held a hearing on the appellant's motion to suppress over the course of three days — August 12, 2011, September 15, 2011, and November 18, 2011.

13

At the hearing, the following relevant evidence was adduced through witnesses called by the State. (The appellant did not testify or produce any evidence.) In the hospital Emergency Room, the appellant and Christian gave several different accounts of the events that led to the appellant's injury, first to the medical staff at the hospital and then to Officer Crum and Detective Janowitz. Before the appellant was discharged from the hospital, Detective Janowitz requested that a gunshot residue test be performed on the appellant's hands.

As discussed above, the appellant was transported from the hospital to the Baltimore County Police Department in a police vehicle. He was not given *Miranda* warnings at any time before being questioned by Detective Janowitz. The questioning took place in an interview room at the Baltimore County police headquarters. There were no officers guarding the door. Detective Janowitz was in plainclothes, with no visible weapon. He was the only interviewer. The interview lasted 15 minutes. The appellant was not restrained in any way before or during the interview.

During the interview, the appellant again changed his story, finally telling Detective Janowitz that while Christian was cleaning his gun in their apartment he accidentally shot the appellant in the foot. Because the apartment was in Baltimore City, Detective Janowitz notified the Baltimore City Police Department, which, as explained, sent two detectives to interview the appellant.

Before the appellant was interviewed by those detectives, he was given *Miranda* warnings. After the interview, the appellant was held so he could be arrested by police officers from Harford County on an outstanding warrant that was unrelated to the events in the instant case.

After considering all of the evidence, on March 2, 2012, the circuit court issued a memorandum opinion and order denying the appellant's motion to suppress. The court concluded that the appellant was not in custody when he was interviewed by Detective Janowitz at police headquarters, and therefore the police were not required to advise him of his rights under *Miranda* before interviewing him. The court further found, for the same reason, that the appellant's statement to the Baltimore City police detectives was not inadmissible "fruit of the poisonous tree" evidence.

The appellant contends the circuit court erred by denying his motion to suppress the un-*Mirandized* statement he made to Detective Janowitz and the subsequent statement he gave to Detectives Henry and Jenkins. He argues that, following his release from the hospital on the morning of August 18, 2007, he was subjected to a custodial interrogation by Detective Janowitz, and, because he was not given *Miranda* warnings before that interrogation, his statement was not admissible. He further argues that his subsequent statement to Detectives Henry and Jenkins was not admissible because it would not have occurred but for the unwarned statement

to Detective Janowitz. The appellant maintains that admission of the improper statements was not harmless error, and therefore his convictions must be vacated.

The State responds that the circuit court properly weighed the totality of the circumstances and concluded that, when the appellant made the challenged statement to Detective Janowitz, he was not in custody, and therefore *Miranda* warnings were not required. Accordingly, the statements to Detective Janowitz and to Detectives Henry and Jenkins properly were admissible.

When reviewing the denial of a motion to suppress, we consider only the evidence adduced at the suppression hearing and view it in the light most favorable to the prevailing party. *Moody v. State*, 209 Md. App. 366, 379 (2013) (citing *State v. Tolbert*, 381 Md. 539, 548 (2004)). "We defer to the trial court's factual findings and uphold them unless they are shown to be clearly erroneous." *Rodriguez v. State*, 191 Md. App. 196, 214-15 (2010) (citing *Owens v. State*, 399 Md. 388, 403 (2007)). We make our own independent de novo assessment of whether the defendant's constitutional rights were violated by reviewing the law and applying it to the facts of the case. *Moody v. State*, 209 Md. App. at 379. Specifically, "we conduct our own independent constitutional appraisal of the record to determine if, on the facts found, the defendant was 'in custody." *Id.* (citing *Buck v. State*, 181 Md. App. 585, 609 (2008)); *see also McAvoy v. State*, 314 Md. 509, 515 (1989) ("Armed with the facts properly found by the trial judge, we must, however, make an independent constitutional appraisal of the record to determine the correctness of the trial judge's decision concerning custody.").

In *Miranda v. Arizona*, 384 U.S. 436, 457-58 (1966), the United States Supreme Court announced warnings that police officers must provide to suspects prior to custodial interrogation.

> [P]olice are required, prior to any custodial interrogation, to inform a suspect that he or she has a right to remain silent, that any statement he or she does make can be used as evidence against him or her, and that he or she has the right to the presence of an attorney, either retained or appointed.

*Thomas v. State*, 429 Md. 246, 249 n.1 (2012). The protections of *Miranda* are aimed at preventing a suspect from being compelled to incriminate himself or herself in contravention of the Fifth Amendment.[ ] *Id.* at 259.

*Miranda* warnings need only be given if the person to be interviewed is subjected to custodial interrogation. *See Moody*, 209 Md. App. at 380 (citing *J.D.B. v. North Carolina*, ___ U.S. ___, 131 S.Ct. 2394, 2401-02 (2011)). If a person is questioned but is not interrogated, or if a person is interrogated but is not in custody, *Miranda* warnings are not required. *See Whitfield v. State*, 287 Md. 124, 131 (1980) (directing that a suspect's un-*Mirandized* statements "need only

15

be excluded from evidence if they 'flow from a custodial interrogation within the meaning of *Miranda*.") (quoting *Vines v. State*, 285 Md. 369, 374 (1979)).

Custodial interrogation occurs when "questioning [is] initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Rodriguez v. State*, 191 Md. App. 196, 216 (2010) (quoting *Miranda*, 384 U.S. at 444). A person is "interrogated" when he or she is subjected to direct questioning by the police regarding his or her involvement in a criminal act, or "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Owens v. State*, 399 Md. 388, 428 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)); *see also Drury v.State*, 368 Md. 331, 335-36 (2002) (test to determine interrogation is "whether the words and actions of the officer were reasonably likely to elicit incriminating responses from [suspect].").

A person is "in custody" when a reasonable person, under all the circumstances, "would understand that his freedom of action is restricted to a degree associated with formal arrest." *Aguilera-Tovar v. State*, 209 Md. App. 97, 108 (2012) (quoting *Thomas*, 202 Md. App. at 567). To determine a suspect's custodial status, we consider the totality of the circumstances, applying an objective standard, without regard for the subjective intent of law enforcement officers. We take into consideration the following non-exhaustive factors:

> when and where [the interrogation] occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning whether he came completely on his own, in response to a police request or escorted by police officers. Finally, what happened after the interrogation whether the defendant left freely, was detained or arrested may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning.

*Owens*, 399 Md. at 428-29 (quoting *Whitfield*, 287 Md. at 141).

In the case at bar, the findings of fact made by the circuit court all are supported by the testimony elicited at the hearing on the appellant's motion to suppress, and therefore are not clearly erroneous. Considering those facts in the light most favorable to the State, we are persuaded that the appellant was not "in custody" when he was questioned by Detective Janowitz. Therefore, *Miranda* warnings were not required.

Detective Janowitz's interview of the appellant lasted only 15 minutes, occurring sometime between 7:43 a.m. and 8:15 a.m., promptly after the appellant arrived at the police headquarters. Detective Janowitz questioned the appellant on his own, without any other officers present. Detective Janowitz was in plainclothes and did not have a visible firearm. The interview room was unlocked and unguarded, and the appellant was not restrained. The questions Detective Janowitz asked were brief and neutral, and focused on the events that led to the appellant's gunshot wound.

Before the appellant was questioned by Detective Janowitz, he was not booked, fingerprinted, photographed, or held in a cell. There was no action taken against him to indicate that he was being arrested or was going to be arrested. There was nothing to suggest that Detective Janowitz thought the appellant was anything other than a victim, either of a crime or an accident, or that the detective thought that the appellant was a perpetrator of a crime. The appellant points out that, before he was transported to the police station, his hands were tested for gunshot residue at Detective Janowitz's request. As Detective Janowitz testified, however, he was investigating how the appellant had come to be shot in the foot, and one possible explanation, for which a gunshot residue test would be relevant, was that the gunshot wound was self-inflicted.

The police are not required to give *Miranda* warnings before questioning a witness who is not suspected of wrongdoing. *See Tillery v. State*, 3 Md. App. 142, 147 (1968) (holding that questioning did not constitute a custodial interrogation when an individual was being questioned as a witness, rather than as a suspect). *See also Miranda*, 384 U.S. at 444 n.4 (noting the court's intention that its holding was intended to apply to those who were the focus of a formal investigation).

When the appellant was questioned, before Hemphill's body even was discovered at the Keyser Motel, the police had no reason to believe the appellant later would become a suspect in Hemphill's murder. Indeed, the potential connection between the appellant and the crimes for which he eventually was tried would not be discovered for a few years. Nor were the statements the appellant made to Detective Janowitz that were admitted into evidence at trial clearly inculpatory. They were, at most, indicative of dishonesty, not guilt. Moreover, the trial court assessed the atmosphere in the interview room during the questioning as being "comfortable, non-hostile and consistent with the questioning of a witness."

The appellant was transported to the police station in a police vehicle. He had no means of transportation to get from the hospital to the police station, however, because Christian's vehicle had been impounded. And, even if the appellant had wanted to drive himself, he could not have done so because of his foot injury.

> To be sure, at the conclusion of the interviews by Detectives Janowitz, Henry, and Jenkins, the appellant was not permitted to leave. Instead, he was taken into custody by police officers from Harford County. His arrest was completely unrelated to any statements he made during his interviews, however, or to the crimes for which he eventually was tried. As noted, the arrest was pursuant to an outstanding warrant on charges unrelated to the crimes in this case. Detective Janowitz questioned the appellant only about the shooting that caused the injury to the appellant's foot. At no time did Detective Janowitz question the appellant about the violation for which a warrant was issued for his arrest in Harford County, or about the crimes for which the appellant ultimately was convicted in the instant case. Detective Janowitz did not mention the outstanding Harford County arrest warrant at any time during the interview; therefore, when he was being interviewed, the appellant had no reason to believe he would be held by the police after answering their questions.
>
> For all these reasons, we conclude, as did the circuit court, that the appellant was not in custody when he was interviewed by Detective Janowitz and, therefore, his rights under *Miranda* were not violated when Detective Janowitz questioned him without first giving him those warnings. Because Detective Janowitz's interview of the appellant did not violate his rights, the interview by Detectives Henry and Jenkins was not tainted. The circuit court correctly denied the appellant's motion to suppress evidence.

ECF No. 5-1, Filed Separately Exhibit 13, pp. 13-22.

The Court finds the Court of Special Appeals determination to be a reasonable application of law and it shall not be overturned. Under the Fifth Amendment, statements a suspect makes during a custodial interrogation may not be used against him in court unless the government first advises the suspect of his rights. *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966). To determine whether a person was in *Miranda* custody, the Supreme Court has asked whether "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *New York v. Quarles*, 467 U.S. 649, 655 (1984) (internal citation omitted). "[W]hether a suspect is 'in custody' is an objective inquiry," such that the actual, subjective beliefs of the defendant and interviewing officers are irrelevant. *J.D.B. v. N. Carolina*, 564 U.S. 261, 131 S.Ct. 2394, 2402, (2011).

The state court's findings are supported by the record. The record establishes, and this Court determines, that Brown was not in custody at the time he provided his statement to Detective Janowitz. There is no basis for finding constitutional deficiencies in the state court proceeding, and Brown has failed to rebut the presumption of correctness of the findings of fact of the Court of Special Appeals opinion underlying the rejection of this ground for relief.

### Appellate Court Review

In his amended claim, Brown claims that the Court of Special Appeals of Maryland erred in "sustaining a conviction based on a different theory not presented to the jury at trial." ECF No. 4. It is correctly observed that the ground raises no federal claim and is therefore not a basis for habeas corpus relief. The federal habeas statute "unambiguously provides that a federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.' " *Wilson v. Corcoran,* 562 U.S. 1, 131 S.Ct. 13 (2010) (quoting 28 U.S.C. § 2254(a)). It is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts. The habeas statute unambiguously provides that a federal court may issue the writ to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "Federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire,* 502 U.S. 62, 67 (1991) (quoting *Lewis v. Jeffers,* 497 U.S. 764, 780 (1990)). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." 502 U.S., at 67–68, 112 S.Ct. 475.

### Conclusion

In light of the rulings of the Court, the instant Petition for habeas corpus relief will be denied, and this case will be dismissed by separate Order. When a district court dismisses a habeas petition, a Certificate of Appealability may issue Aonly if the applicant has made a

substantial showing of the denial of a constitutional right.@ 28 U.S.C. § 2253(c)(2). When the district court denies relief on the merits, a prisoner satisfies this standard by demonstrating that reasonable jurists would find that the district court's assessment of the constitutional claims is debatable or wrong. *Slack v. McDaniel,* 529 U.S. 473, 484 (2000); *see Miller–El v. Cockrell,* 537 U.S. 322, 336–38, (2003). Brown does not satisfy this standard, and the Court declines to issue a Certificate of Appealability.

Date: October 6 , 2016                                     _____/s/_____
                                                           RICHARD D. BENNETT
                                                           UNITED STATES DISTRICT JUDGE